UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| JIN ZHU,<br><br>           Plaintiff,<br><br>        v.<br><br>NORTH CENTRAL EDUCATIONAL<br>SERVICE DISTRICT - ESD 171,<br><br>           Defendant. | NO. 2:15-CV-00183-JLQ<br><br>MEMORANDUM OPINION AND<br>ORDER RE: MOTIONS FOR<br>SUMMARY JUDGMENT |

## I.    Introduction

BEFORE THE COURT is Plaintiff's Motion for Partial Summary Judgment (ECF No. 31) and Defendant North Central Educational Service District ESD 171's ("ESD 171") Motion for Summary Judgment (ECF No. 34). In his Motion for Partial Summary Judgment, Plaintiff seeks a finding of a disparate impact violation of the Washington Law Against Discrimination ("WLAD") and a violation of the Washington State Public Records Act ("PRA"). ESD 171 opposed the Motion. *See* (ECF No. 36). On June 16, 2016, Plaintiff filed a Reply. *See* (ECF No. 38).

In its Motion for Summary Judgment, ESD 171 seeks dismissal of all of Plaintiff's claims. *See* (ECF No. 34). Plaintiff filed a Response opposing the Motion and asserting genuine issues of material fact exist precluding dismissal of all claims. *See* (ECF No. 39). ESD 171 filed a Reply. (ECF No. 40). Oral argument on ESD 171's Motion was heard on July 29, 2016. Michael Love argued on behalf of Plaintiff and Jerry Moberg argued for ESD 171. This Order memorializes the court's rulings on the Motions.

//

ORDER - 1

## II.    Background and Procedural History

In summary judgment proceedings, the facts are viewed in a light most favorable to the non-moving party.

### A.    The Parties

Plaintiff was born in China and immigrated to the United States in 2004. (ECF No. 31-3 at ¶2). From 2006 to 2012, Plaintiff was employed as a math teacher in the Waterville School District. (ECF No. 31-3 at ¶3). On September 28, 2010, Plaintiff filed a race discrimination and retaliation suit against Waterville School District and its superintendent. *See Zhu v. Waterville School District No. 209, et al.*, No. 2:10-CV-00333-LRS (E.D. Wash.). Plaintiff settled this litigation on March 13, 2012, and resigned his position with the Waterville School District as a condition of the settlement agreement. (ECF No. 31-3 at ¶7).

ESD 171 is one of nine educational service districts in the state of Washington created by statute to: "(1) Provide cooperative and informational services to local school districts; (2) Assist the superintendent of public instruction and the state board of education in the performance of their respective statutory or constitutional duties; and (3) Provide services to school districts and to the Washington state center for childhood deafness and hearing loss and the school for the blind to assure equal educational opportunities." RCW 28A.310.010. ESD 171's board is allowed, upon request of a school district served by the ESD, to "provide cooperative and informational services not in conflict with other law that provide for the development and implementation of programs, activities, services, or practices that support the education of preschool through twelfth grade students in the public schools or that support the effective, efficient, or safe management and operation of the school district or districts served by the educational service district." RCW 28A.310.200(7). ESD 171 serves 29 school districts: Methow Valley, Oroville, Tonasket, Omak, Nespelem, Okanogan, Grand Coulee Dam, Bridgeport, Brewster, Pateros, Manson, Stehekin, Lake Chelan, Entiat, Cascade, Mansfield, Coulee-Hartline, Waterville, Orondo, Cashmere, Wenatchee, Eastmont,

Palisades, Quincy, Ephrata, Soap Lake, Wilson Creek, Moses Lake, and Warden. *See* Washington State School Districts Map, Washington State Office of Superintendent of Public Instruction, http://www.k12.wa.us/maps/Maps.aspx (last visited August 19, 2016).

**B.    The Math-Science Specialist Position**

ESD 171 posted a job opening announcement for a Math-Science Specialist opening on May 25, 2012, and closed on June 14, 2012. (ECF No. 35-1 at 25, 33-35). The job posting stated the minimum qualifications included: a bachelor's degree in education or related science field; three years of experience teaching mathematics and/or science; and effective oral and written communication skills. (ECF No. 35-1 at 33). The preferred qualifications included: master's degree in education or related math and science field and five years teaching mathematics and/or science; significant successful experience teaching math and/or science and teacher leadership with multiple grade bands and vertical teams; and experience managing workshops and special events. (ECF No. 35-1 at 33). The job posting stated to apply, applicants must submit a cover letter, resume, three current letters of recommendation, and an application form from the School District. (ECF No. 35-1 at 33).

On May 30, 2012, Plaintiff applied for the Math-Science position with ESD 171 by submitting an employment application and the required supporting materials. All applications were screened by ESD 171 staff. (ECF No. 35-1 at ¶7). There were five candidates for the Math-Science position, four of which met the minimum qualifications. (ECF No. 35-3 at ¶8). Plaintiff, along with Andrew Hickman and Jeremy Kelley were chosen to be interviewed for the position. (ECF No. 35-1 at ¶7).

On June 19, 2012, all three individuals were interviewed by a panel of ESD 171 employees consisting of Mechelle LaLanne, Cindy Duncan, Mary Jane Ross (formerly a math and bilingual English as a Second Language teacher for ESD 171), and Suzanne Reister (currently the Associate Executive Director, HR/Workers' Comp/Unemployment for ESD 171). (ECF No. 35-1 at ¶7); (ECF No. 39-3 at 55-90). Each interview lasted 45 minutes. (ECF No. 35-1 at ¶7). During the interviews, the panel members took notes of

each candidate's answers to questions. (ECF No. 35-1 at ¶8). After the interviews were completed, the interview panel discussed their notes and reached a consensus on who to hire. (ECF No. 35-1 at ¶8). Each member rated Hickman as the top candidate, Kelley as the second choice, and Plaintiff as the lowest rated candidate. (ECF No. 35-1 at ¶¶8-9). On June 28, 2012, Hickman was hired for the Math-Science position. (ECF No. 35-1 at ¶6); (ECF No. 39-2 at 144).

On February 6, 2014, Plaintiff sent a letter to ESD 171 wherein he alleged Hickman made a false statement of his professional qualifications to obtain the Math-Science position in violation of the Washington Administrative Code. (ECF No. 39-3 at 117). Plaintiff attached the interview notes from the panelists to support his claim that Hickman falsely stated he had taught all levels (elementary school, middle school, and high school). *See* (ECF No. 39-3 at 118-22). ESD 171 Superintendent McBride received the letter and responded by letter dated February 19, 2014, stating he determined Washington Administrative Code section 181-87-050 is "not applicable" because "[i]t pertains only to those employed in a certificated position." (ECF No. 39-3 at 123).

## C. Regional Science Refurbishment Assistant Position

On March 28, 2013, ESD 171 posted an opening for a Regional Science Refurbishment Assistant, a part-time, temporary position which closed "when filled." (ECF No. 35-1 at 37). The required qualifications included a high school diploma and experience organizing inventory. (ECF No. 35-1 at 37). The preferred qualifications included experience managing materials and working in a school, warehouse, or purchasing/receiving environment. (ECF No. 35-1 at 37). To apply, applicants needed to provide a cover letter, resume, three current letters of recommendation, and complete ESD 171's application form. (ECF No. 35-1 at 37).

On April 1, 2013, Jesse Swider, a Caucasian female, applied for the Refurbishment Assistant position. (ECF No. 31-2 at 110). She submitted a letter, but was not required to submit letters of recommendation because she previously worked for ESD 171 and her abilities were known. (ECF No. 35-1 at ¶13). Swider was the first person to contact ESD

171 concerning the Refurbishment position. (ECF No. 35-1 at ¶12).

On April 3, 2013, Plaintiff emailed Reister stating his interest in the Refurbishment Assistant position and asking whether he needed to resubmit his application. (ECF No. 31-3 at 230). On April 4, 2013, Reister responded, informing Plaintiff all she would need is a letter of interest for the position. (ECF No. 31-3 at 230). On April 5, 2013, Plaintiff sent Reister a letter of interest and his updated resume. (ECF No. 31-3 at 229).

In addition to Plaintiff and Swider, two other individuals applied for the position. (ECF No. 31-2 at 60-61). Plaintiff was the only one of the four candidates to submit letters of recommendation. (ECF No. 35-1 at ¶14).

There was no interview process for filling the Refurbishment Assistant position, After she submitted her application, Swider was taken to the center and the job was explained to her. (ECF No. 35-1 at ¶15).

On April 16, 2013, Plaintiff emailed Suzanne Reister, Managing Director at ESD 171, to see when interviews for the Refurbishment position would take place. (ECF No. 31-3 at 44). Reister responded, stating: "We are currently working out details on this." (ECF No. 31-3 at 44).

On April 17, 2013, Swider signed a Internal Revenue Service W-4 form for the Refurbishment position. (ECF No. 31-2 at 112). On April 18, 2013, Plaintiff was informed he was not selected for the Refurbishment position. (ECF No. 31-3 at ¶15).

On July 11, 2013, Plaintiff sent a letter to ESD 171 asking why he was not selected for either the Math-Science or Refurbishment position. (ECF No. 35-1 at 18). On August 8, 2013, Reister responded by letter, stating Hickman and Plaintiff were both qualified for the Math-Science position, but Hickman had "stronger qualifications" in a number of specific areas. (ECF No. 35-1 at 18). Regarding the Refurbishment position, Reister explained: "[g]iven the temporary and part-time nature of the position and prior to receiving any applications the decision was made to review individual packets in the order received; review applicant qualifications; and if the applicant met the minimum qualifications, he/she would be taken to the refurbishment center for an on-site visit to

see if it was a good match for both the candidate and center coordinator." (ECF No. 35-1 at 18). Because Swider, the first candidate, "met the criteria required above... [n]o further candidates were screened or interviewed for this position." (ECF No. 35-1 at 18).

The process used to fill the Refurbishment position has been termed "first come, first served." *See* (ECF No. 31-1 at ¶38). This practice is used "on occasion" when "an emergency may require." (ECF No. 31-2 at 33). However, "this particular position or a part-time refurbishment helper out there, that's the only time" ESD 171 used a "first come, first served" practice to fill such a position. (ECF No. 31-2 at 70).

**D. Plaintiff's Public Records Act Request**

On January 13, 2014, Plaintiff submitted a public records request for "a copy of North Central ESD's programs (effective prior to June 21, 2012) that encouraged the school districts in North Central Washington to employ minority teachers and/or that aimed to increase minority staff in the NCESD." (ECF No. 31-2 at 140). On January 22, 2014, Reister, on behalf of ESD 171, sent a letter to Plaintiff acknowledging receipt of his public records request, and stating "[w]e estimate the time of response will be approximately February 27, 2014... based upon the need to locate and assemble the records requested and/or to determine whether any of the requested records are exempt from public disclosure." (ECF No. 31-2 at 142).

Reister spoke to legal counsel for ESD 171 "about the programs that Mr. Zhu was referring to determine whether we had anything responsive to his request." (ECF No. 35-1 at ¶19). Reister "looked to see if I could find a program that we had." (ECF No. 35-1 at ¶19). Reister "thought that Mr. Zhu was asking for programs... one of the services we provide." (ECF No. 35-1 at ¶20).

On February 27, 2014, Reister sent a letter to Plaintiff informing him "[t]here are no records responsive to your request. Educational Service Districts are not required to have affirmative action programs." (ECF No. 31-2 at 144).

On August 18, 2015, during the course of discovery in the instant matter, Plaintiff requested ESD 171 to: "Produce each ESD 17 [sic] policy, practice, or procedure that

relates to or is associated with discrimination, equal opportunity, and/or retaliation that was in effect during the January 1, 2012, to May 1, 2013 timeframe." (ECF No. 17-1 at 9). On October 28, 2015, ESD 171 responded, identifying responsive documents, including "5600 P-1 Affirmative Action" and "5600 Affirmative Action." (ECF No. 17-1 at 9); (ECF No. 17-1 at 16-18).

**E.    Plaintiff's Subsequent Job Applications**

After Plaintiff resigned from his teaching position with the Waterville School District, he applied for several other positions with school districts located within ESD 171, detailed below. ESD 171 was not directly involved in those matters.

In April 2012, Plaintiff applied for a Math Teacher and a Science Teacher position with the Wenatchee School District. (ECF No. 39-5 at ¶¶35, 37). Plaintiff was not given an interview for either position. (ECF No. 39-5 at ¶¶35, 37).

On May 21, 2012, Plaintiff applied for two Math Teacher positions with the Wenatchee School District which emphasized Advanced Placement math teaching experience. (ECF No. 39-5 at ¶39). He was not given an interview for either of those positions. (ECF No. 39-5 at ¶39).

On May 23, 2012, Plaintiff applied for a Non-Continuing Math/Science Teacher position (.33 FTE) with the Wenatchee School District. (ECF No. 39-5 at ¶42). He was not given an interview for the position. (ECF No. 39-5 at ¶42).

On May 23, 2012, Plaintiff also applied for a Reopened High School Summer School Lead Teacher position with the Wenatchee School District and was not given an interview for that position. (ECF No. 39-5 at ¶44).

On June 8, 2012, Plaintiff applied for a Jr/Sr High School Math Teacher position and a High School Science Teacher position with the Brewster School District. (ECF No. 39-5 at ¶45). He was not given an interview for either position. (ECF No. 39-5 at ¶45).

On June 14, 2012, Plaintiff applied for and was not given an interview for a Middle School Science Teacher position and a Middle School Math Teacher position with the Lake Chelan School District. (ECF No. 39-5 at ¶46).

On August 8, 2012, Plaintiff applied for and was not selected to interview for a Middle School Math Intervention Teacher position with the Bridgeport School District. (ECF No. 39-5 at ¶47). On August 10, 2012, ESD 171 Superintendent Richard McBride made a phone call to the Bridgeport School District. (ECF No. 39-3 at 180). Superintendent McBride cannot recall talking to anyone else at Bridgeport besides Superintendent Sattler over the last couple of years. (ECF No. 39-3 at 102). Sattler could not recall what he and McBride spoke about on that date. (ECF No. 39-3 at 145). Sattler and McBride "talk about a lot of issues, a lot of things that are happening in our school district. (ECF No. 39-3 at 144). Their conversations occur "not that often." (ECF No. 39-3 at 146-47).

On August 10, 2012, Edith Sattler, Superintendent Sattler's mother, applied for the Math Intervention position with Bridgeport School District. (ECF No. 39-3 at 182). Ms. Sattler and Plaintiff were the only applicants for the position. (ECF No. 39-3 at 197). Ms. Sattler was selected for the position. (ECF No. 39-3 at 198).

On or about September 7, 2012, Plaintiff applied for and was not given an interview for a Science and Math Teacher 2012-2013 position with the Methow Valley School District. (ECF No. 39-5 at ¶50).

On October 18, 2012, representatives from ESD 171, Bridgeport School District, Wenatchee School District, Methow Valley School District, Waterville School District, Lake Chelan School District, Brewster School District, and Mansfield School District met for a Superintendents' Advisory Committee meeting. (ECF No. 39-3 at 115). Reister reported to the committee regarding a meeting she had with the claims team and attorney. (ECF No. 39-3 at 116).

On March 5, 2013, a phone conversation between McBride and the Bridgeport School District took place. (ECF No. 39-3 at 181).

On March 28, 2013, Plaintiff applied for and was not selected for a Middle School Math Intervention Teacher position with the Bridgeport School District. (ECF No. 39-5 at ¶51).

On or about April 8, 2013, Plaintiff applied for and was not selected to interview for a Middle School Science Teacher position with the Bridgeport School District. (ECF No. 39-5 at ¶¶54, 56).

On May 14, 2013, Plaintiff emailed the Bridgeport Superintendent, Scott Sattler, asking if the two positions had been filled. (ECF No. 39-5 at 75). Superintendent Sattler responded stating both positions had been filled. (ECF No. 39-5 at 75). The only individuals who applied for the Math Intervention position were Plaintiff and Frank Lynn Moore, II. (ECF No. 39-3 at 198). However, Moore did not apply until August 2, 2013. (ECF No. 39-3 at 160).

On May 30, 2013, Plaintiff applied and was not given an interview for a substitute-certified position with Mansfield School District. (ECF No. 39-5 at ¶59).

On July 8, 2013, Plaintiff applied for and was not given an interview for a 9-12 Science Teacher position with Brewster School District. (ECF No. 39-5 at ¶59).

On April 28, 2014, Plaintiff applied for and was not given an interview for a Summer Program Academic Lead position and Summer Program Academic Coordinator position with the Orondo School District. (ECF No. 39-5 at ¶63).

### III.   Legal Analysis

**A.   Summary Judgment Standard**

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the material facts before the court. *Northwest Motorcycle Ass'n v. U.S. Dept. of Agriculture*, 18 F.3d 1468, 1471 (9th Cir. 1994).  The moving party is entitled to summary judgment when, viewing the evidence and the inferences arising therefrom in the light most favorable to the nonmoving party, there are no genuine issues of material fact in dispute. Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  While the moving party does not have to disprove matters on which the opponent will bear the burden of proof at trial, they nonetheless bear the burden of producing evidence that negates an essential element of the opposing party's claim and the ultimate burden of persuading the court no genuine issue of material fact exists. *Nissan Fire &*

*Marine Ins. Co. v. Fritz Companies*, 210 F.3d 1099, 1102 (9th Cir. 2000). When the nonmoving party has the burden of proof at trial, the moving party need only point out there is an absence of evidence to support the nonmoving party's case. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).

Once the moving party has carried its burden, the opponent must do more than simply show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the opposing party must come forward with specific facts showing there is a genuine issue for trial. (*Id.*).

Although a summary judgment motion is to be granted with caution, it is not a disfavored remedy: "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (citations and quotations omitted).

**B.    42 U.S.C. § 1981**

Plaintiff brought both discrimination and retaliation claims against ESD 171under 42 U.S.C. § 1981. ESD 171 sought summary judgment on these claims claiming there is no evidence an official policy or custom of ESD 171 caused Plaintiff's alleged injury. Even if such a policy or practice existed, ESD 171 asserts Plaintiff's federal discrimination and retaliation claims fail on the merits.

Under 42 U.S.C. § 1983, municipalities cannot be held liable under the theory of *respondeat superior. Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 691 (1978). A municipality can only be held liable if "action pursuant to official municipal policy of some nature caused a constitutional tort." (*Id.*). The Ninth Circuit has extended the reasoning of *Monell* to hold there is no *respondeat superior* liability under 42 U.S.C. § 1981 against state actors. *Federation of African American Contractors v. City of Oakland*, 96 F.3d 1204, 1215 (9th Cir. 1996).

There are three ways to establish municipal liability under *Monell*. The plaintiff

may prove: (1) an employee committed the constitutional violation "pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity"; (2) the constitutional tort was committed by "an official with final policy-making authority and that the challenged action itself thus constituted an act of official governmental policy"; or (3) "an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992) (internal quotation marks and citations omitted).

When a plaintiff alleges a policy as the basis of the claimed constitutional violation, that party must identify the policy so "a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 403-04 (1997). An alleged "custom" which has not been formally approved may be actionable if "the relevant practice is so widespread as to have the force of law." (*Id*. at 404); *see also*, *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) ("Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy."). Some Circuits hold the existence of a policy forbidding the alleged constitutional violation is not a defense when the evidence shows the anti-discrimination policies are not followed. *See Daskalea v. District of Columbia*, 227 F.3d 433, 443 (D.C. Cir. 2000) ("a 'paper' policy cannot insulate a municipality from liability where there is evidence ... that the municipality was deliberately indifferent to the policy's violation."); *Ware v. Jackson County, Mo.*, 150 F.3d 873, 882 (8th Cir. 1998) ("[T]he existence of written policies of a defendant are of no moment in the face of evidence that such policies are neither followed nor enforced.").

The parties agree ESD 171 is a municipal government agency. *See* (ECF No. 19 at ¶1); (ECF No. 22 at ¶1). Plaintiff asserts the policies at issue causing disparate treatment

discrimination are: (1) the "first come, first served" hiring practice regarding the temporary Refurbishment position; (2) "deliberate indifference to its [ESD171's] Affirmative Action policies/procedures"; and (3) "deliberate indifference to [ESD 171's] undertakings with the government that require implementation of Affirmative Action programs." (ECF No. 39 at 15). For the reasons set forth below, Plaintiff failed to identify a policy or practice which caused his alleged injury and summary judgment on Plaintiff's federal discrimination and retaliation claims is Granted

### 1.    "First Come, First Served"

Plaintiff admitted the "first come, first served" practice is not based on a written policy and asserted it has never been used other than for the Refurbishment position. (ECF No. 39 at 17). This practice, used only one time, is not a "policy or custom" as defined above. Additionally, as set forth below in the discussion of Plaintiff's state law claim, the "first come, first served" practice does not disparately impact minorities. For these reasons, the "first come, first served" practice does not constitute a policy or custom from which ESD 171 may be found liable under 42 U.S.C. § 1981.

### 2.    Affirmative Action Policies

ESD 171 has affirmative action policies in place requiring affirmative action reporting to the district's board, compiling a list of employment agencies to notify female and minorities of openings, and submitting a report of female and minority applicant data. (ECF No. 17-1 at 16-18). Because Plaintiff is asserting the failure to follow these policies as the basis of his § 1981 claim, he must show such failure caused or was "the moving force" behind the discrimination and retaliation. *See Chew v. Gates*, 27 F.3d 1432, 1444 (9th Cir. 1994) (quoting in part *Monell*, 436 U.S. at 694).

Even if the court accepts Plaintiff's characterization of ESD 171's noncompliance as "deliberate indifference," Plaintiff failed to link such noncompliance with the failure to hire him. For example, he does not show how failing to submit annual reports or post job openings to minority hiring agencies caused him to be passed over by the interview panel. Plaintiff was able to apply for the Math-Science job and was interviewed. The

policy at issue does not speak to anything which would have impacted the interview panel's process of selecting a candidate for the Math-Science position from the available candidates. Because there is no evidence which could reasonably infer the failure to follow specific affirmative action policies caused discrimination or retaliation against Plaintiff, his 42 U.S.C. § 1981 claims cannot be based on this alleged noncompliance.

### 3.    Affirmative Action Regulations

ESD 171 has entered contracts requiring compliance with, *inter alia*, 41 C.F.R. § 60. *See* (ECF No. 39-2 at 41, 50, 58, 65). ESD 171 Superintendent McBride admitted ESD 171 was not currently in compliance with 41 C.F.R. § 60 in relation to "quantitative analyses." (ECF No. 39-2 at 25); *see* 41 C.F.R. § 60-2.10(b)(1). McBride also admitted to not having any specific programs encouraging ESD 171 to increase minority staff. (ECF No. 39-2 at 19-20). Although ESD 171 places openings in newspapers across the state and college campuses, there is no emphasis on soliciting applications from minorities. (ECF No. 39-2 at 19).

It is not sufficient for Plaintiff to raise an inference that the failure to have programs encouraging minority representation in the workforce could cause the interview panel to discriminate against Plaintiff. In both of the out-of-Circuit cases relied upon, the Circuits required a showing of "deliberate indifference." *See Daskalea*, 227 F.3d at 441-42; *Ware*, 150 F.3d at 880. "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown*, 520 U.S. at 410.

Plaintiff did not present evidence or argument showing ESD 171's failure to implement programs encouraging minority representation as set forth in the Code of Federal Regulations amounts to disregarding a known or obvious risk minority candidates would not be hired. In an attempt to support this argument, Plaintiff presented statistical evidence allegedly showing under-representation of minorities in ESD 171's workforce.

Plaintiff's statistical evidence shows the ESD 171 workforce is over 90%

Caucasian and there are no Chinese or Asian employees. (ECF No. 39-1 at ¶2). In light of the nearly 50% minority student population within ESD 171, Plaintiff argues these statistics create an inference of discriminatory intent. (ECF No. 39 at 10). However, as of 2015, the general population of three of the four counties comprising ESD 171 was over 90% Caucasian, with the other county being 82% Caucasian. *See* http://www.census.gov/quickfacts/table/PST045215/53007,53017,53047,53025 (last accessed August 17, 2016). Residents of Asian decent comprised only 1% of the entire population in those four counties. *See* (*id.*). Statistics "must show a stark pattern of discrimination unexplainable on grounds other than [race]." *Aragon v. Republic Silver State Disposal, Inc.*, 292 F.3d 654, 663 (9th Cir. 2002) (brackets in original and citations omitted).

Here, the statistics presented fail to raise an inference of discrimination by under-representation. There are no statistics showing how many minority candidates applied for jobs with ESD 171 in an area with a low percentage of minority residents. Without information of qualified minority applicants, it is an unmerited leap to assume discrimination in an area with an extremely low amount of minorities, much less deliberate indifference to the discriminatory result of not implementing affirmative action programs for recruitment.

### 4.    Retaliation

Plaintiff does not point to any specific policy or custom regarding his retaliation claim, nor did he suggest the retaliation claim should be treated any differently than the discrimination claim. Additionally, Plaintiff did not present evidence of a custom of retaliating against individuals who sue ESD 171 or other schools within the district. Without any evidence of a district policy or custom regarding retaliation, summary judgment on Plaintiff's 42 U.S.C. § 1981 retaliation claim is Granted.

### C.    Supplemental Jurisdiction

Having dismissed the federal claims, it is within the discretion of the court to determine whether to accept supplemental jurisdiction over the remaining state law

claims. *See* 28 U.S.C. § 1367(c). However, "when there is power to hear the case under § 1367(a), the district court may exercise supplemental jurisdiction over state law claims without *sua sponte* addressing whether it should be declined under § 1367(c)." *Acri v. Varian Associates, Inc.*, 114 F.3d 999, 1000 (9th Cir. 1997). "[T]he court is not required to make a § 1367(c) analysis unless asked to do so by a party." (*Id*.). Here, neither party raised the issue of supplemental jurisdiction nor objected to this court retaining jurisdiction over pendent state law claims in the event the federal claims were dismissed. The court also notes the state law discrimination and retaliation claims present no new evidence beyond that presented in support of the 42 U.S.C. § 1981 claims. The court also notes the extensive work done by both parties to prepare for trial, which is scheduled to commence on September 12, 2016. As the parties have not objected, the court will address the state law claims without conducting an analysis under 28 U.S.C. § 1367(c).

**D.    Washington Law Against Discrimination**

**1.    Discrimination**

The Washington Law Against Discrimination ("WLAD") prohibits employers from "refus[ing] to hire any person because of ... race, creed, color, [or] national origin." RCW 49.60.180(1). To state a WLAD claim, the plaintiff must show his protected status was a "substantial factor" in the adverse employment action. *See Scrivener v. Clark College*, 334 P.3d 541, 545 (Wash. 2014); *Mackay v. Acorn Custom Cabinetry, Inc.*, 898 P.2d 284, 288 (Wash. 1995).

Washington has adopted the *McDonnell Douglas* test for WLAD discrimination cases. *See Kastinis v. Educational Employees Credit Union*, 859 P.2d 26, 30 (Wash. 1993), *opinion amended at* 865 P.2d 507. Under this burden-shifting test, the plaintiff must make a *prima facie* discrimination case. (*Id*.). Then, the defendant must show a legitimate, non-discriminatory reason for the adverse action. (*Id*.). If the defendant meets its burden, the plaintiff must show the reasons proffered are pretext for a discriminatory purpose. (*Id*.).

Unlike federal statutes, WLAD allows employers to be held liable under the theory

of *respondeat superior*. *Brown v. Scott Paper Worldwide Co.*, 20 P.3d 921, 927 n.3 (Wash. 2001). Thus, the "policy or custom" requirement under *Monell* is not applicable to Plaintiff's state law claims.

In his Motion for Partial Summary Judgment, Plaintiff asserts a disparate impact claim under WLAD. *See* (ECF No. 31). In his response to ESD 171's Motion for Summary Judgment, Plaintiff also asserts a disparate treatment claim under WLAD. (ECF No. 39 at 15-18). ESD 171 asserts Plaintiff's Amended Complaint did not plead a disparate impact discrimination claim under WLAD. (ECF No. 40 at 12).

### a)   Disparate Impact

Plaintiff's Amended Complaint states a cause of action for "RCW 49.60.180 Discrimination" based on ESD 171's alleged use of Plaintiff's race as a "substantial factor" in the decision "to not hire him for either position." (ECF No. 19 at ¶70). ESD 171 asserts this did not properly put it on notice that Plaintiff was asserting a disparate impact claim because he did not allege the "first come, first served" policy was facially neutral but fell more harshly on a protected class. (ECF No. 36 at 9-10). Plaintiff argues: the allegations put ESD 171 on notice its policy was at issue; Plaintiff was bringing a refusal to hire claim; and the statute implicated the disparate impact "bona fide occupational qualification" defense. (ECF No. 38 at 5-6). Assuming, without deciding, Plaintiff properly pled a disparate impact claim, such claim fails on the merits.

There is no dispute the "first come, first served" policy is facially neutral as it contains no language which would discriminate against members of a protected class. Plaintiff asserts the policy falls more harshly on minorities based on: (1) the fact Plaintiff was the only minority of four applicants and he did not get selected even though he was the only applicant to submit a complete application; (2) the fact 92% of ESD 171's employees are Caucasian; and (3) the only time ESD 171 used this policy was on the Refurbishment job. (ECF No. 31 at 13-14).

ESD 171 chose to evaluate and hire the first applicant who submitted an application for the Refurbishment position. Plaintiff was not the first person to submit an

ORDER - 16

application. (ECF No. 31-2 at 110). Although Swider did not submit letters of recommendation, she was excused from this requirement because she had worked for ESD 171 previously and her work was well-known to ESD 171. (ECF No. 35-1 at ¶13). The fact Plaintiff was not selected was not based on his race, but rather because he was not the first person to submit an application. His status as a minority does not raise a reasonable inference that his race was a factor, much less a substantial factor, in the hiring decision for the Refurbishment position.

The racial composition of ESD 171's workforce is not evidence of discrimination, as discussed previously. *See supra* § B(3). Plaintiff did not present any evidence suggesting other minorities had applied for positions with ESD 171 and were rejected, much less based on the "first come, first served" policy. The statistical evidence does not raise an inference of discrimination.

Additionally, the evidence does not suggest "first come, first served" was only used this one occasion or disparately impacts racial minorities. Reister testified she could not recall using it for a temporary position. (ECF No. 31-2 at 70). ESD 171's expert witness stated temporary positions are often not posted and found ESD 171's hiring practices did not discriminate against minority applicants. (ECF No. 35-3 at ¶¶ 22, 24). Based on this undisputed evidence, Plaintiff failed to make a *prima facie* disparate impact showing. The only reason he did not get considered for the Refurbishment position was because he was not the first person to apply. There is no evidence his race had anything to do with the decision or method of choosing an applicant. For these reasons, Plaintiff's Motion for Partial Summary Judgment on this claim is Denied and summary judgment in favor of ESD 171 is Granted on this disparate impact claim.

### b)    Disparate Treatment

To establish a disparate treatment claim, a plaintiff must show the defendant treated some people less favorably than others because of their protected status. *Alonso v. Qwest Communications Co., LLC*, 315 P.3d 610, 615-16 (Wash. App. 2013). This claim may be established by direct evidence of discriminatory intent, or by meeting the

*McDonnell-Douglas* burden-shifting test giving rise to an inference of discrimination. (*Id.* at 616).

To establish a *prima facie* case of disparate treatment racial discrimination under the burden-shifting test, Plaintiff must show: (1) he belongs to a racial minority; (2) he applied and was qualified for a job for which the employer was seeking applicants; (3) despite his qualifications, he was rejected; and (4) the position was filled by a person not of the plaintiff's protected class. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 & n.13 (1973); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993).

ESD 171 asserts Plaintiff cannot make a *prima facie* showing of discrimination. However, ESD 171's brief did not consider the elements cited above. ESD 171's argument is made in the context of 42 U.S.C. § 1981 and did not look at Washington WLAD case law. The undisputed evidence shows the elements cited above are met: Plaintiff belongs to a racial minority, he met the minimum qualifications for both the Math-Science and Refurbishment positions, he was not hired, and the positions were filled by a Caucasian individual. The issue is whether there is a genuine issue of fact that ESD 171's proffered reasons for not hiring Plaintiff were pretextual. Additionally, contrary to ESD 171's argument, Plaintiff may rely on the same evidence used to establish his *prima facie* case to prove pretext and is not required to bring forth any additional evidence. *See Milligan v. Thompson*, 42 P.3d 418, 423 (Wash. App. 2002).

ESD 171 stated it did not hire Plaintiff for the Math-Science position because "after a careful review of all candidates, the hiring committee concluded that Plaintiff was not the most qualified candidates [sic] for the position." (ECF No. 34 at 2). During the interview, the interview panel members all gave high scores to Hickman and rated him as the best candidate while ranking Plaintiff as the least desirable candidate.

ESD 171 asserted Plaintiff did not get hired for the Refurbishment position because it used a "first come, first served" practice to fill the position. Swider was the first person to submit an application and was hired. Plaintiff was not considered because he applied after Swider.

ORDER - 18

Plaintiff argues deeming Plaintiff least qualified is pretext because the nature of the Math-Science position (being a "teach of teacher" position) made Plaintiff the most qualified individual for the position based on results in his prior teaching position. *See* (ECF No. 39 at 16-17). ESD 171's expert witness reviewed the qualifications of both Plaintiff and Hickman and found "there was a significant difference in experiences... [and] a qualitative difference in the relevance of their experience as it related to the role of the Math-Science Specialist position" in favor of Hickman being more qualified. (ECF No. 35-3 at ¶¶16-18). Plaintiff did not submit expert testimony to rebut ESD 171's expert witness.

Plaintiff argued the statistics concerning racial composition of ESD 171's workforce shows the proffered reasons are pretext. As previously addressed, the statistical evidence only shows a high percentage of Caucasian employees, but does not give any information whereby the court can infer minority applicants applied and were rejected for employment on the basis of race. *See supra* § B(3). Under Washington law, "statistics are relevant to show that an employer's asserted justification for not hiring or promoting the plaintiff is a facade for discrimination." *Shannon v. Pay 'N Save Corp*., 709 P.2d 799, 808 (Wash. 1985), *abrogated in part on other grounds as recognized by Louisiana-Pacific Corp. v. Asarco Inc.*, 934 P.2d 685, 688 (Wash. 1997). Here, the statistics presented fail to raise an inference of pretext. There are no statistics showing how many minority candidates applied for jobs with ESD 171. Without such information, it is an unmerited leap to assume discrimination solely because there are not many minorities employed by ESD 171. The statistical information does not show pretext.

ESD 171 has affirmative action policies in place requiring the reporting of affirmative action activities to the district's board, compiling a list of employment agencies to notify female and minorities of openings, and submitting a report of female and minority applicant data. (ECF No. 31-1 at 16-18). There are contracts requiring compliance with, *inter alia*, 41 C.F.R. § 60. *See* (ECF No. 39-2 at 41, 50, 58, 65). ESD 171 Superintendent McBride admitted ESD 171 was not currently in compliance with 41

C.F.R. § 60. (ECF No. 39-2 at 25); *see* 41 C.F.R. § 60-2.10(b)(1).

Plaintiff also argues ESD 171 violated state law by not submitting a complaint to the State in response to Plaintiff's report alleging Hickman misrepresented his experience. (ECF No. 39 at 11); *see* (ECF No. 39-3 at 117-23). The state law at issue applies to "any certificate holder licensed under rules of the professional educator standards board to serve as a certificated employee." WAC 181-87-035. The superintendent of an educational service district is required to submit a written complaint to the state superintendent when he "possesses sufficient reliable information to believe that a certificated employee ... has committed an act of unprofessional conduct." WAC 181-86-110; *see* WAC 181-87-050(1) (defining unprofessional conduct to include falsification or deliberate misrepresentation concerning "Statement of professional qualifications"). McBride explained he did not report Plaintiff's accusations to the state because Hickman is in a classified position and the state regulation applies only to certified staff members. (ECF No. 39-3 at 107-08). It appears the statute applies to Hickman, based on his certification, rather than excluding him based on his position. Given the clear language of the provision applying to the certificated status of the employee, and not the position, the failure to report Plaintiff's complaint raises an inference of pretext.

It also appears Hickman did not receive a six month evaluation which is required of all probationary employees. *See* (ECF No. 39-2 at 104-05, 120-53). Hickman also received some negative reviews in his year-end review and was later placed onto a specialized plan to improve his performance. *See* (ECF No. 39-2 at 146-53). Plaintiff argues this is evidence of discrimination because ESD 171 "went out of its way to keep a poorly performing white employee" by not subjecting him to a six month review which would have been "termination worthy." (ECF No. 39 at 12). This argument is unconvincing. Even if true, the argument does not demonstrate disparate treatment because Plaintiff does not assert other minority employees were treated differently under the same or similar circumstances. Nor is there evidence other minority employees were

subject to a six month evaluation or were disciplined more harshly for similar conduct than Hickman. While it might be unusual Hickman did not receive a six month review, the subsequent corrective actions appear to be reasonable attempts to address issues with an employee. There is no evidence suggesting the steps taken were done to avoid having to hire Plaintiff.

To support his argument regarding alleged deviations from workplace policies, Plaintiff cites *Porter v. California Dept. of Corrections*, 383 F.3d 1018, 1026 (9th Cir. 2004). However, that opinion was amended and superseded at 419 F.3d 885 (9th Cir. 2004). The superseding opinion removed the subsection which included the discussion regarding deviation from workplace rules. *See* 419 F.3d at 886. Notwithstanding Plaintiff's misplaced reliance, there is non-binding case law from the Tenth Circuit holding deviation from workplace procedures can be evidence of discrimination when supported by other evidence supporting the discrimination claim. *See Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1220 (10th Cir. 2002). As discussed above, the corrective actions taken with Hickman do not raise a reasonable inference of discrimination against Plaintiff. However, the failure to follow 41 C.F.R. § 60 and failure to report Plaintiff's complaint of Hickman's misrepresentation raises a question of fact as to whether ESD 171's reasons were pretext.

Plaintiff argues the "first come, first served" practice demonstrates pretext because Plaintiff was the only applicant to submit a complete application and it was the only time the practice was used to fill a position. (ECF No. 39 at 17). Plaintiff did not "submit" an application for this position, but rather asked ESD 171 to use his application on file for the Math-Science position. As discussed previously, the evidence only suggests the practice had not been previously used to fill a temporary position. Additionally, the undisputed evidence shows it is rare for a temporary position to even be opened for outside applications. (ECF No. 35-3 at ¶22). The reason Plaintiff was not considered was because he was not the first person to apply. Race did not matter, and there is no evidence to suggest the practice was used to purposefully avoid hiring Plaintiff or any other

1   minority individual.

2       Plaintiff also argues the handling of his public records request for programs related

3   to employing minorities within ESD 171 raises an inference of discrimination. As

4   discussed below, ESD 171 violated the Public Records Act by failing to produce the

5   affirmative action policies which were responsive to Plaintiff's request. However, since

6   the Public Records Act requires no finding of intent, the violation does not necessarily

7   mean the withholding was intentional or malicious. The evidence submitted in support of

8   that claim shows ESD 171 narrowed the scope of Plaintiff's request based on an

9   unreasonable, but without any apparent ill-will, interpretation of Plaintiff's request. *See*

10  *infra* § F. The misunderstanding of Plaintiff's public records request does not raise an

11  inference of racial discrimination in relation to the Math-Science and Refurbishment

12  positions.

13      Lastly, Plaintiff argues discrimination can be inferred because the Waterville

14  School District and ESD 171 use the same claims administrator and had communications

15  regarding Plaintiff. (ECF No. 39 at 17-18). Prior to his lawsuit against the Waterville

16  School District, Plaintiff was investigated by the Waterville School District's claims

17  administrator for nine months. (ECF No. 39-5 at ¶5). At the conclusion of the

18  investigation, Waterville School District gave Plaintiff notice of probable cause for

19  discharge. (ECF No. 39-5 at ¶5). The notice of discharge led to Plaintiff's lawsuit against

20  Waterville School District. *See* (ECF No. 39-5 at ¶¶5-6). The same claims administrator

21  investigated and denied Plaintiff's claim against ESD 171 in the instant matter. (ECF No.

22  39-3 at 124). There were conversations between ESD 171 and the claims administrator

23  regarding Plaintiff between January 1, 2006, and April 15, 2013. (ECF No. 39-3 at 127).

24  Even accepting this evidence as true, it does not support a racial discrimination claim

25  because evidence relating to Plaintiff's prior lawsuit does not infer discrimination on the

26  basis of Plaintiff's race.

27      Because there is evidence raising an inference of pretext, ESD 171's Motion for

28  Summary Judgment on Plaintiff's disparate treatment WLAD claim is Denied.

### 2.    Retaliation

The WLAD prohibits any employer "to discharge, expel, or otherwise discriminate against any person because he or she has opposed any practices forbidden by this chapter, or because he or she has filed a charge, testified, or assisted in any proceeding under this chapter." RCW 49.60.210(1). To establish a WLAD retaliation claim, the plaintiff must show: (1) he or she was engaged in statutorily protected activity; (2) an adverse employment action was taken; and (3) there is a causal link between the plaintiff's activity and the employer's adverse action. *Francom v. Costco Wholesale Corp.*, 991 P.2d 1182, 1191 (Wash. App. 2000). "The plaintiff need not show that retaliation was the only or 'but for' cause of the adverse employment action, but he or she must establish that it was at least a substantial factor." (*Id.*). "Because employers rarely will reveal they are motivated by retaliation, plaintiffs ordinarily must resort to circumstantial evidence to demonstrate retaliatory purpose." *Currier v. Northland Servs., Inc.*, 332 P.3d 1006, 1013 (Wash. App. 2014) (citation and quotation marks omitted). WLAD retaliation claims use the same burden-shifting test used in WLAD discrimination cases. *See Milligan*, 42 P.3d at 424.

ESD 171 made no specific arguments on Plaintiff's WLAD retaliation claim, and did not even reference Plaintiff's WLAD retaliation claim in its Motion for Summary Judgment. *See* (ECF No. 39 at 16-17). Nonetheless, the court analyzes the claim on the merits below.

a)    ***Prima Facie Case***

Plaintiff asserted there is sufficient evidence to make a *prima facie* retaliation claim based on circumstantial evidence of: (1) the closeness in time between his lawsuit against the Waterville School District and the hiring decision by ESD 171 for the Math-Science position; (2) statistics showing underrepresentation of minorities in ESD 171's workforce; (3) deviations from workplace rules; (4) inconsistency and shifting reasons; and (5) Plaintiff's superior job qualifications to the successful applicant. (ECF No. 39 at 9).

Plaintiff settled his lawsuit against the Waterville School District on March 13, 2012, and unsuccessfully interviewed for the ESD 171 Math-Science position three months later. (ECF No. 31-3 at ¶7); (ECF No. 39-3 at 55). Two of the Math-Science interview panel members were aware of the lawsuit against Waterville. (ECF No. 39-5 at ¶8); (ECF No. 39-2 at 107-08); *see Renz v. Spokane Eye Clinic, P.S.*, 60 P.3d 106, 111 (Wash. App. 2002) (knowledge of the protected activity, along with subsequent adverse action, can establish a *prima facie* case); *see also*, *Miller v. Fairchild Industries, Inc.*, 885 F.2d 498, 505 (9th Cir. 1989) (motive can be inferred when the decision makers were aware of protected activity). The closeness in time between the protected activity and adverse action can "suggest retaliatory motivation." *Estevez v. Faculty Club of University of Washington*, 120 P.3d 579, 590 (Wash. App. 2005); *see also*, *Stegall v. Citadel Broadcasting Co.*, 350 F.3d 1061, 1069 (9th Cir. 2003) (holding a nine day gap between the protected activity and the adverse action demonstrated pretext); *Miller v. Fairchild Industries, Inc.*, 885 F.2d 498, 505 (9th Cir. 1989) (adverse action within 59 days of protected activity can raise inference of retaliation); *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (adverse action within three months of the protected activity is sufficient to establish a *prima facie* case); *but see*, *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002) (18 months between the activity and adverse action is too long to raise inference of causation). Based on the admitted knowledge of Plaintiff's lawsuit, along with the closeness in time, this evidence supports a *prima facie* showing.

For the reasons discussed elsewhere in this Order, Plaintiff's statistical evidence does not support his claims. Additionally, it is unclear how statistics of racial composition of workforce would establish a retaliation claim. If the statistics showed the number of people who engaged in protected activity and were subsequently subjected to adverse action, then it could arguably be relevant to Plaintiff's claim. However, racial composition does not help Plaintiff establish a *prima facie* retaliation claim or raise an inference of retaliation.

Similarly, ESD 171's affirmative action policies and alleged non-compliance with

the Code of Federal Regulations do not have any bearing on Plaintiff's retaliation claim because his retaliation claim is based on his protected activity, not race.

Plaintiff also argues ESD 171 Superintendent McBride's failure to submit a complaint in response to Plaintiff's letter regarding alleged misrepresentations by Hickman infers retaliation against Plaintiff. As discussed previously, it appears McBride should have submitted a complaint in response to Plaintiff's letter because the statute applies to certificated employees, not only certificated positions. *See* WAC 181-86-110; WAC 181-87-050(1). Although Plaintiff's letter was sent February 6, 2014, almost two years after ESD 171 hired Hickman, the fact it was not reported to the state raises an inference of covering up alleged retaliation.

The same rationale does not apply to the six month evaluation Hickman did not receive. Even if ESD 171 was taking actions above and beyond the ordinary practice to keep Hickman employed, Plaintiff's assertion it was done to avoid hiring Plaintiff is misstated. If ESD 171 discharged Hickman, it was not obligated to hire Plaintiff. ESD 171 could have re-opened the position and choose from any applicant, or it could have attempted to hire Kelley, who was the interview committee's second choice behind Hickman.

Plaintiff asserts inconsistencies show circumstantial evidence in support of his *prima facie* retaliation claim. Specifically, Plaintiff relies on a screening matrix signed prior to the interviews. The screening matrix gave a negative score for Plaintiff and positive score for Hickman in relation to "proof of effective communication skills" but later, ESD 171 HR Managing Director Resister, who was a member of the interview panel, told Plaintiff he and Hickman both "demonstrated effective communication skills." (ECF No. 39 at 12); (ECF No. 39-3 at 43, 132). The matrix also gave two positive marks to Kelley for having a bachelor of arts degree in an education **or** science field and only gave Plaintiff one positive mark. (ECF No. 39-2 at 79); (ECF No. 39-3 at 10). Kelley had a bachelor's in Elementary Education and Plaintiff had a bachelor's in Chemistry, with minors in math, physics, and computer programming. Plaintiff also had a Masters (which

he asserts is equivalent to a PhD in the United States) in Semantics and a Secondary Teaching Certificate from St. Martin's University, Lacey, Washington. (ECF No. 39-2 at 79); (ECF No. 39-3 at 10). The high marks for Kelley appear reasonable, considering his bachelor's degree is in education. On the other hand, it is unclear why Plaintiff's Chemistry degree received less positive marks when it is precisely within the scope of what ESD 171 sought. While it is far from clear why the different ratings were assigned, the timing of the marks and possible inconsistencies are sufficient to support a *prima facie* case of retaliation.

Plaintiff also argues there are inconsistent explanations regarding an alleged meeting of the interview panel before the interviews took place. (ECF No. 39 at 13). The HR Managing Director testified "there is always a gathering" prior to interviews, and she stated such meeting took place prior to the interviews for the Math-Science position. (ECF No. 39-2 at 109-10). One of the other panelists could not recall such a meeting taking place. (ECF No. 39-3 at 44). These alleged inconsistencies could be the result of fading memories, and do not necessarily imply a conversation about Plaintiff's lawsuit against Waterville took place. Contrary to Plaintiff's assertion, case law regarding inconsistent reasons is not on point because the alleged inconsistencies regarding the meeting are not reasons for not hiring Plaintiff. *See Payne v. Norwest Corp.*, 113 F.3d 1079, 1080 (9th Cir. 1997); *see also*, *Renz*, 60 P.3d at 112 (conflicting reasons for the **adverse action** can create competing inferences).

Lastly, Plaintiff argues a *prima facie* retaliation showing is made in relation to the Refurbishment job. ESD 171 required three letters of recommendation for that position, Plaintiff was the only applicant to submit three letters of recommendation yet did not obtain an interview. The successful candidate did not comply with this requirement. (ECF No. 31-1 at ¶ 15, 19, 20-25, 28). ESD 171 admits it excused Swider's non-compliance because she had previously worked for ESD 171. (ECF No. 35-1 at ¶¶12-13). The "first come, first served" method of filling the temporary position is not unusual and it is not uncommon for the position to be filled without a formal posting of the opening. *See* (ECF

No. 35-3 at ¶22). Additionally, the decision to allow Swider to interview without submitting three letters of recommendation does not infer retaliation against Plaintiff because he had not yet stated his interest in the position. *See Odima v. Westin Tucson Hotel*, 53 F.3d 1484, 1492 (9th Cir. 1995) (considering an old application when a "well-qualified" minority candidate was **already seeking the position** supports a finding of discrimination). As this is the only evidence supporting the retaliation claim regarding the Refurbishment position, Plaintiff failed to make a *prima facie* thereon and ESD 171 is entitled to summary judgment on that claim. However, because Plaintiff made a *prima facie* showing of retaliation in relation to the Math-Science position, it became ESD 171's burden to set forth non-retaliatory reasons for hiring another candidate.

### b)    ESD 171's Non-retaliatory Reasons

ESD 171 asserted the reason Plaintiff was not hired for the Math-Science position is because the interview panel determined Hickman was the most qualified candidate to fill the Math-Science position. The interview panel considered Hickman "way out ahead of the other candidates." (ECF No. 35-1 at ¶9). This was based on, *inter alia*, Hickman's experience and professional development. *See* (ECF No. 35-3 at ¶¶17-18). A member of the interview panel stated Plaintiff's "race and national origin had absolutely nothing to do with the hiring decision." (ECF No. 35-1 at ¶10). These reasons meet ESD 171's burden because they are sufficient evidence of a legitimate, non-retaliatory reason for not hiring Plaintiff.

### c)    Pretext

A plaintiff may show the defendant's proffered reasons are pretext by showing: "(1) the reasons have no basis in fact, (2) even if based in fact, the employer was not motivated by these reasons, or (3) the reasons are insufficient to motivate an adverse employment decision." *Renz*, 60 P.3d at 110. If the plaintiff produces sufficient evidence to show "reasonable but competing inferences" of retaliation and non-discriminatory bases for the adverse action, the case must proceed to the jury. *See Hill v. BCTI Income Fund-I*, 23 P.3d 440, 449 (Wash. 2001), *rejected in part on other grounds by McClarty v.*

ORDER - 27

*Totem Elec.*, 137 P.3d 844 (Wash. 2006). The plaintiff may show pretext by using the same evidence used to establish the *prima facie* case. *Milligan*, 42 P.3d at 423.

Plaintiff did not present any additional evidence or argument to show pretext, but instead wove arguments regarding pretext into his *prima facie* argument. As discussed above, the evidence is unclear who was the most qualified candidate between Plaintiff and Hickman. Although ESD 171's expert witness stated Hickman was more qualified, Plaintiff contends he was more qualified. In the context of WLAD discrimination claims, an employer can choose among equally qualified individuals without violating the statute. *See Kuyper v. State*, 904 P.2d 793, 796-97 (Wash. App. 1995). The issue is whether ESD 171 downplayed Plaintiff's qualifications as pretext for retaliation. ESD 171 cites cases under federal law giving the employer discretion to choose among qualified applicants, but the court is unaware of any case law from Washington regarding such discretion in retaliation cases. *See Cichon v. Exelon Generation Co., LLC*, 401 F.3d 803, 813 (7th Cir. 2005) ("where an employer's proffered non-discriminatory reason for its employment decision is that it selected the most qualified candidate, evidence of the applicants' competing qualifications *does not constitute evidence of pretext* unless [the plaintiff's case demonstrates that those qualifications] are so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue.") (citations and quotation marks omitted, brackets and emphasis in original).

The evidence presented shows a dispute as to the relative qualifications of Hickman and Plaintiff. Plaintiff had experience teaching at a junior high and high school level, held multiple graduate degrees, and developed a high school curriculum. Hickman held an education degree, had taught at both the elementary and middle school levels, and had been involved in other professional development programs where he taught other teachers. While Hickman may be more qualified, it is a disputed fact.

Additionally, ESD 171 offered no explanation for the inconsistent scoring on the matrix dated prior to the interviews. Giving higher scores for seemingly equally desirable

1  degrees for the position to Kelley and lower scores to Plaintiff suggests an ulterior

2  motive. As this is a reasonable interpretation of the evidence, there is a genuine issue of

3  fact on Plaintiff's retaliation claim.

4      The totality of the evidence is sufficient to infer pretext. For these reasons,

5  summary judgment ESD 171's Motion for Summary Judgment on the WLAD retaliation

6  claim pertaining to the Math-Science position is Denied.

7  **E.    Blacklisting**

8      Washington's "blacklisting" statute makes it a criminal offense to "willfully and

9  maliciously make or issue any statement or paper that will tend to influence or prejudice

10 the mind of any employer against the person of such person seeking employment." RCW

11 49.44.010. This statute provides a civil cause of action for violations thereto. *See Moore*

12 *v. Commercial Aircraft Interiors, LLC*, 278 P.3d 197, 203 (Wash. Ct. App. 2012).

13     ESD 171 asserted Plaintiff has no evidence it contacted other potential employers

14 or willfully and maliciously prevented him from obtaining employment. In response,

15 Plaintiff offered circumstantial evidence based on communications between ESD 171 and

16 other schools where Plaintiff applied and based on the timing of such communications

17 and Plaintiff's applications. *See* (ECF No. 39 at 19-21). Plaintiff did not present any

18 direct evidence showing his name came up during the communications or was the topic

19 of those communications.

20     The issue is whether Plaintiff's circumstantial evidence raises a reasonable

21 inference ESD 171 willfully and maliciously disclosed information concerning Plaintiff

22 to prospective employers in order to prevent him from securing employment. There is

23 little case law addressing Washington's blacklisting statute in general or a case stating a

24 claim brought pursuant to the statute requires direct evidence. In general, "any fact in

25 issue may be established by circumstantial evidence if, when the circumstances are

26 shown, they with reasonable certainty lead to the conclusion of the existence of the fact in

27 issue." *Grady v. Dashiell*, 163 P.2d 922, 929 (Wash. 1945), *overruled in part on other*

28 *grounds by In re Phillips' Estate*, 278 P.2d 627 (Wash. 1955); *see also*, *Robins v.*

*Schonfeld*, 326 F. Supp. 525, 530 (S.D.N.Y. 1971) (finding proof of blacklisting on the basis of circumstantial evidence without any direct evidence); *Johnson v. Oregon Stevedoring Co.*, 270 P. 772, 775-76 (Or. 1928) (holding circumstantial evidence was sufficient to take to the jury on conspiracy to blacklist claim).

It is unsurprising Plaintiff lacks direct evidence of blacklisting, since the alleged communications were oral and it is unlikely a person would freely admit to telling another employer not to hire an individual. The controlling question is whether Plaintiff's circumstantial evidence, taken as a whole, raises a reasonable inference of blacklisting. Plaintiff met this burden.

First, there is circumstantial evidence conversations took place between ESD 171 Superintendent McBride and Superintendent Sattler during the timeframe Plaintiff applied for employment at the Bridgeport School District in August 2012 and March 2013. (ECF No. 39-3 at 102, 180-81); (ECF No. 39-5 at ¶47). The evidence does not foreclose the possibility of a discussion about Plaintiff during any of those calls, although it might not be probable.

Second, the timing of events supports Plaintiff's theory of blacklisting. Plaintiff applied for a position with Bridgeport on August 1, 2012, informed the superintendent of his application on August 8, 2012, and two days later the superintendent spoke with McBride. (ECF No. 39-5 at ¶47); (ECF No. 39-3 at 180, 197). The same day the two superintendents spoke, Bridgeport filled the position by hiring an allegedly less qualified individual who was also the superintendent's mother. (ECF No. 39-3 at 151-52, 157, 182, 198). Plaintiff was the only other applicant for the position and did not receive an interview. (ECF No. 39-3 at 197). On March 18 and 27, 2013, two positions with Bridgeport opened and Plaintiff was one of only two individuals to apply for each these positions. (ECF No. 39-5 at ¶¶51, 54); (ECF No. 39-3 at 198-99). The superintendent spoke with the Bridgeport School District two weeks prior to the first job opening. (ECF No. 39-3 at 181). On May 13, 2013, Sattler informed Plaintiff the positions had been filled, despite the fact the successful candidate had not yet applied for one of the

positions. *See* (ECF No. 39-3 at 160, 198); (ECF No. 39-5 at 75). The timing of these events further raises the inference of some sort of blacklisting.

There are also multiple teaching positions Plaintiff applied for and did not receive interviews for which occurred after a meeting between those school districts, ESD 171, and Waterville to discuss legal claims. *See* (ECF No. 39-3 at 115-16). There is no direct evidence stating Plaintiff's case against Waterville was discussed, and the only evidence from the meeting suggests a general discussion but does not indicate whether any specific cases were discussed. (ECF No. 39-3 at 115-16).

Lastly, Plaintiff presented evidence suggesting the successful candidates at various school districts were chosen under dubious circumstances. The successful candidates were allegedly less qualified than Plaintiff. *See* (ECF No. 39-3 at 151-52, 157, 16364, 175-76, 182-83, 198-99, 203); (ECF No. 39-5 at ¶¶17, 36, 38, 40, 52, 55). For two of the positions, Sattler admitted Plaintiff "had more experience and qualifications" than the successful candidate. (ECF No. 39-3 at 163). Other than the positions involving Plaintiff, Sattler could not recall any other time where only two individuals applied and but only one individual received an interview. (ECF No. 39-3 at 158-59). Additionally, Superintendent Sattler told Plaintiff that Bridgeport School District does not notify candidates they are not chosen to interview.  (ECF No. 39-3 at 188). However, the Bridgeport School District ordinarily notifies applicants when they are not selected for the open position. *See* (ECF No. 39-3 at 169-70).

There may be other explanations for why Plaintiff was not interviewed or hired for these positions. However, Plaintiff needs only raise a reasonable inference these acts occurred because ESD 171 communicated with those potential employers to not hire Plaintiff. The circumstantial evidence on the record raises such an inference. Significantly, ESD 171 presented no evidence addressing the blacklisting claim. Because the undisputed evidence raises an inference of blacklisting, summary judgment on the blacklisting claim is Denied.

**F.    Public Records Act**

The Public Records Act ("PRA") "is a broadly worded mandate for disclosure of state government records." *Kozol v. Washington State Dept. of Corrections*, 366 P.3d 933, 935 (Wash. Ct. App. 2015). "The act should be liberally construed and its exemptions should be narrowly construed in favor of disclosure." *Soter v. Cowles Pub. Co.*, 174 P.3d 60, 68 (Wash. 2007). Claims brought under the PRA may be determined solely on affidavits and motions. *See* RCW 42.56.550(3); *O'Neill v. City of Shoreline*, 240 P.3d 1149, 1156-57 (Wash. 2010).

The Public Records Act requires all state and local agencies to disclose any public record upon request unless the record falls within certain specific exemptions. *Progressive Animal Welfare Soc. v. University of Washington*, 884 P.2d 592, 597 (Wash. 1994). A record is "disclosed," within the meaning of the Public Records Act, "if its existence is revealed to the requester in response to a PRA request, regardless whether it is produced." *Sanders v. State*, 240 P.3d 120, 125 (Wash. 2010). Agencies are not required to "create or produce a record that is nonexistent." *Sperr v. City of Spokane*, 96 P.3d 1012, 1015 (Wash. Ct. App. 2004).

Agencies are required to make a "sincere and adequate search for records." *Fischer Broadcasting-Seattle TV LLC v. City of Seattle*, 326 P.3d 688, 692 (Wash. 2014). The agency's search "must be reasonably calculated to uncover all relevant documents." *Neighborhood Alliance of Spokane County v. County of Spokane*, 261 P.3d 119, 128 (Wash. 2011). "[A]n inadequate search is a violation of the PRA because it precludes an adequate response." (*Id*. at 130). The fact additional responsive documents exist is a separate issue from whether the agency conducted an adequate search. (*Id*. at 128). An agency may demonstrate an adequate search by having its employee submit "reasonably detailed, nonconclusory affidavits attesting to the nature and extent of their search." *Nissen v. Pierce County*, 357 P.3d 45, 57 (Wash. 2015) (citation and internal quotation marks omitted).

"When an agency denies a public records request on the grounds that no responsive records exist, its response should show at least some evidence that it sincerely attempted

to be helpful." *Fisher Broadcasting*, 326 P.3d at 692. While a request for public records is "not required to use the exact name of the record," a request "must be for identifiable records or class of records." (*Id.*). Agencies are not required to be mind readers. *Bonamy v. City of Seattle*, 960 P.2d 447, 451 (Wash. Ct. App. 1998).

Plaintiff requested: "[a] copy of North Central ESD's programs (effective prior to June 21, 2012) that encouraged the school districts in North Central Washington to employ minority teachers and/or that aimed to increase minority staff in the NCESD." (ECF No. 31-2 at 140). One month after acknowledging Plaintiff's request, ESD 171 informed Plaintiff there were no records responsive to his request and "Educational Service Districts are not required to have affirmative action programs." (ECF No. 31-2 at 142).

The document Plaintiff asserts was responsive to his request is ESD 171's Administrative Procedures policy entitled "Affirmative Action." *See* (ECF No. 17-1 at 16-18). The document's purpose restates ESD 171's commitment to affirmative action and establishes "[t]he superintendent will appoint an Affirmative Action Officer to ensure personnel procedures are followed, a work force profile is developed and an annual affirmative action report is made to the board." (ECF No. 17-1 at 16). The document also sets forth the personnel procedures for affirmative action, including compiling "a list of employment agencies or other job referral sources for use in notifying women and minorities of position openings." (ECF No. 17-1 at 16).

Nearly two weeks after the summary judgment hearing, ESD 171 filed a supplemental brief arguing, for the first time, this court lacked jurisdiction to adjudicate the PRA claim. ESD 171 asserted it filed the brief based on the court's preliminary impressions regarding the PRA claim. However, ESD 171 presented no reason why its jurisdictional argument was not included in its original Motion. Because it does not present newly decided cases, the argument could have been raised in the initial Motion for Summary Judgment. Plaintiff has moved to strike the supplemental brief as, *inter alia*, being untimely. *See* (ECF No. 64). The court agrees the brief and argument is untimely

and should have been included in the initial Motion for Summary Judgment.  However, because the ESD 171's untimely argument is without merit, the court Denies the Motion to Strike the supplemental brief.

Contrary to ESD 171's contention, the PRA provides a cause of action to private individuals to remedy violations of the PRA. *See, e.g.*, *Neighborhood Alliance*, 261 P.3d at 130 (holding an inadequate search is tantamount to an inadequate response under the PRA and declining to add an **additional** cause of action under the PRA based solely on an inadequate search); *O'Neill*, 240 P.3d at 1156 ("a PRA **cause of action** can be decided based on affidavits alone") (emphasis added); *Hobbs v. State*, 335 P.3d 1004, 1011 (Wash. App. 2014) (noting a PRA requester's cause of action accrues "when the agency has taken final action and denied the requested records"). In the case ESD 171 cites, the district court found the PRA does not provide a cause of action untethered to a public records request. *See Olson v. Uehara*, No. C13-0782 RSM, 2014 WL 6808818, *7 (W.D. Wash. December 2, 2014). Additionally, that case is currently on appeal, a fact ESD 171 did not disclose. *See Olson v. Uehara*, No. 14-36100 (9th Cir.).

It is clear the PRA provides for a cause of action arising from the violation thereof by an agency. While the PRA provides for venue in the county where the responsive record is held, this court has original jurisdiction of Plaintiff's federal claims and supplemental jurisdiction of all state law claims pursuant to 28 U.S.C. § 1367. The PRA claim falls within that category and ESD 171's argument to the contrary is unavailing.

Turning to the merits, ESD 171 seeks summary judgment on the PRA claim because, it contends, it adequately responded to Plaintiff's request and there were no documents which were responsive to Plaintiff's request. (ECF No. 34 at 19). ESD 171 states "[i]f Plaintiff would have requested 'policies' instead of 'programs' this entire issue would have been avoided." (ECF No. 36 at 4). ESD 171 also argues it was not required to seek clarification from Plaintiff because conferring with its counsel concerning the request was sufficient. (ECF No. 34 at 19).

In its argument, ESD 171 focuses on the word "programs" and contends Plaintiff's

use of that word prevented ESD 171 from understanding Plaintiff sought policies. However, when taken in full context of the request, ESD 171 unreasonably narrowed the scope of the request to only include affirmative action programs. The fact Plaintiff included an "effective" date in his request further supports the conclusion his request sought policies, not just ESD 171's "services."

The only evidence ESD 171 submitted documenting its search for responsive records is Reister's affidavit wherein she states: "I spoke to Val Hughes, our legal counsel at Perkins Coie in Seattle, about the programs that Mr. Zhu was referring to determine whether we had anything responsive to his request. I looked to see if I could find a program we had." (ECF No. 35-1 at ¶19). This statement lacks the specificity required by the Washington Supreme Court. *See Nissen*, 357 P.3d at 57. For example, Reister's affidavit does not state where she searched for responsive records, or the method by which she searched (i.e. search terms if an electronic search was conducted, types of documents she searched for). Talking to counsel about the request and "looking to see" if she could find a program is insufficient to carry ESD 171's burden of showing it conducted an adequate search for records. For these reasons, ESD 171's Motion for Summary Judgment on the PRA claim is Denied.

In the Motion for Partial Summary Judgment, Plaintiff requests summary judgment on the issue of liability for a PRA violation. Plaintiff argues a finding of a PRA violation is warranted because ESD 171 failed to seek clarification from Plaintiff as to what he meant by "programs," failed to explain the scope of its search for responsive records, and failed to expand the scope of its search beyond "programs." (ECF No. 31 at 3). Plaintiff asserts ESD 171 silently withheld responsive records. (ECF No. 31 at 6).

After reviewing Plaintiff's request and ESD 171's affirmative action policy, the court finds the document was responsive to the public records request. The definition of "program" includes "a plan or system under which action may be taken toward a goal." Merriam-Webster's Online Dictionary, http://www.merriam-webster.com/dictionary/program (last visited August 16, 2016); *see*

*Serres v. Washington Dept. of Retirement Systems*, 261 P.3d 173, 180 (Wash. Ct. App. 2011) ("Courts may resort to dictionary definitions to give undefined, nontechnical terms their usual and ordinary meaning."). ESD 171's affirmative action policy fits squarely within that definition, and there is no basis in the definition of "program" to limit it to "services." Even if such narrowing were reasonable, the affirmative action policy requires the establishment of an Affirmative Action Officer and various duties thereto. Whether or not the policy has been followed in this regard is immaterial, because the policy is responsive to Plaintiff's request even if it were meant to only seek "services." ESD 171 did not argue the policy would be subject to an exemption. Because the policy was responsive to Plaintiff's request, ESD 171 violated the PRA by failing to produce the affirmative action policy.

ESD 171's other arguments against finding a violation of the PRA are unavailing. First, ESD 171's evidence regarding its responses to other public records requests from Plaintiff has no bearing on determining whether ESD 171 complied with the PRA regarding this request. *See Zink v. City of Mesa*, 166 P.3d 738, 743-44 (Wash. Ct. App. 2007). Second, ESD 171 incorrectly attempts to shift its burden onto Plaintiff by contending he should have used "policies" rather than "programs" in his request. *See Neighborhood Alliance*, 261 P.3d at 128 (holding "the **agency** bears the burden, beyond material doubt, of showing its search was adequate") (emphasis added).

For all of the above reasons, summary judgment in favor of Plaintiff on the PRA claim is Granted. The court finds ESD 171 violated the PRA by wrongfully withholding responsive records and sets forth at the end of this Order a briefing schedule to determine daily penalties in light of the factors set forth by the Washington Supreme Court in *Yousoufian v. Office of Ron Sims*, 229 P.3d 735 (Wash. 2010).

## G.  ESD 171's Motions to Strike

ESD 171 filed two motions to strike affidavits of Plaintiff. *See* (ECF No. 42); (ECF No. 46). ESD 171's Motions assert the affidavits are not relevant and categorizes the second affidavit, submitted in direct response to an issue raised by ESD 171, as

"scandalous." Those Motions are Denied.

The court agrees with the Seventh Circuit's observation as to why motions to strike are seldom appropriate: motions to strike "serve no purpose except to aggravate the opponent—and though that may have been the goal here, this goal is not one the judicial system will help any litigant achieve. Motions to strike disserve the interest of judicial economy. The aggravation comes at an unacceptable cost in judicial time." *Redwood v. Dobson*, 476 F.3d 462, 471 (7th Cir. 2007). ESD 171 would have been better served contesting the relevancy of Plaintiff's affidavits in its brief. *See* (*id.*); *Custom Vehicles, Inc. v. Forest River, Inc.*, 464 F.3d 725, 726-27 (7th Cir. 2006). Notwithstanding the denial of ESD 171's Motions, the court has reviewed the affidavits and given them their proper weight, if any, in considering ESD 171's Motion for Summary Judgment.

## IV.    Conclusion

Because Plaintiff fails to show his 42 U.S.C. § 1981 discrimination and retaliation claims are based on a policy or custom, summary judgment for the Defendant on those claims is Granted. Because the parties did not object or raise issue with the court exercising supplemental jurisdiction over the state law claims, the court has not conducted a 28 U.S.C. § 1367(c) analysis. Plaintiff's circumstantial evidence is sufficient to defeat ESD 171's Motion for Summary Judgment on the WLAD disparate treatment and retaliation claims and blacklisting claim.

ESD 171 unreasonably narrowed to scope of its search for records responsive to Plaintiff's public records request. Based on its failure to conduct an adequate search, ESD 171 silently withheld responsive records. Accordingly, Plaintiff's Motion for Partial Summary Judgment on a violation of the PRA is Granted. However, because Plaintiff failed to raise an issue of material fact as to a disparate impact claim under WLAD, his Motion is Denied as to that claim and summary judgment is Granted in favor of ESD 171.

///

///

///

ORDER - 37

**IT IS HEREBY ORDERED**:

1.    Plaintiff's Motion for Partial Summary Judgment (ECF No. 31) is **GRANTED IN PART AND DENIED IN PART** as set forth herein.

2.    Defendant North Central ESD 171's Motion for Summary Judgment (ECF No. 34) is **GRANTED IN PART AND DENIED IN PART** as set forth herein.

3.    Defendants' [sic] Motion to Strike Inadmissible Evidence (ECF No. 42) and Defendant's Motion to Strike Declaration of Plaintiff Re Wenatchee School District Employee (ECF No. 46) are **DENIED**.

4.    Plaintiff's Motion to Strike Defendant's Supplemental Authority and Motion in Limine Reply (ECF No. 64) is **DENIED IN PART** and **RESERVED IN PART**. The court will address the request to strike Defendant's Motion in Limine Reply brief at the Pretrial Conference.

5.    Plaintiff's discrimination and retaliation claims brought pursuant to 42 U.S.C. § 1981 are **DISMISSED WITH PREJUDICE**.

6.    Plaintiff's disparate impact claim brought pursuant to the Washington Law Against Discrimination is **DISMISSED WITH PREJUDICE**.

7.    Plaintiff's retaliation claim regarding the Refurbishment position brought pursuant to Washington Law Against Discrimination is **DISMISSED WITH PREJUDICE**.

8.    The court finds Defendant ESD 171 violated the Washington Public Records Act (RCW 42.56 *et. seq.*) by failing to produce records responsive to Plaintiff's request for public records.

9.    Within **14 days** of this Order, the parties shall each submit a brief, no longer than 10 pages, addressing the statutory penalty range set forth in RCW 42.56.550(4) and factors set forth by the Washington Supreme Court in *Yousoufian v. Office of Ron Sims*, 229 P.3d 735 (Wash. 2010).

**IT IS SO ORDERED**.  The Clerk is hereby directed to enter this Order and furnish copies to counsel.

Dated August 22, 2016.

s/ Justin L. Quackenbush
JUSTIN L. QUACKENBUSH
SENIOR UNITED STATES DISTRICT JUDGE

ORDER - 39